No UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EDWIN MILLS, et al.,

    Defendants.
_____/

Case No. 16-cr-20460

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT PATRICK JOHNSON'S**
**MOTION TO PRECLUDE EVIDENCE OF RAP LYRICS AND RAP VIDEOS (Dkt. 367)**

This criminal case involves multiple defendants, all of whom have been charged with violating the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. Defendant Patrick Johnson has filed a motion to preclude the Government from using nine rap lyrics and videos during trial (Dkt. 367), arguing that they are a form of political, social, and artistic expression protected by the First Amendment.[1] He also argues that, under Federal Rule of Evidence 403, the prejudicial effect of admitting this evidence would substantially outweigh any probative value. The Government has filed a response in opposition to the motion (Dkt. 513), to which Johnson replied (Dkt. 522).[2] For the reasons discussed below, the Court grants in part and denies in part Johnson's motion.

### I. BACKGROUND

---

[1] Defendants Edwin Mills, Carlo Wilson, Lomnil Jackson, and Donell Thompson have each filed a notice of joinder concurring in the relief sought in this motion. See Notices of Joinder (Dkt. 432, Mills; Dkt. 437, Wilson; Dkt. 481, Jackson; Dkt. 483, Thompson).

[2] Because oral argument will not aid the Court's decisional process, Johnson's motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the RICO Act. See generally 2d Superseding Indictment (Dkt. 292).³ That indictment claims that Defendants were members and associates of a criminal enterprise—the "6 Mile Chedda Grove" street gang in Detroit—one of whose purposes was to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of violence." Id. at 2, 6. The enterprise purportedly operated on the east side of Detroit within an area bordered roughly by East McNichols Road to the north, Kelly Road to the east, Houston-Whittier Street to the south, and Chalmers Street to the west. Id. at 2.⁴ Members and associates of the enterprise would often congregate at certain locations within this territory, including the Hayes Troester Super Market. Id. at 3.

The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. Id. at 5. The sale and distribution alleged was not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. Id.

The indictment charges each defendant, including Johnson, with conspiring to conduct or participate, directly or indirectly, in the conduct of the 6 Mile Chedda Grove enterprise's affairs

---

³ Five of the eleven defendants have since pleaded guilty. The six remaining defendants have been separated into two groups with separate trial dates. See 8/7/2018 Order (Dkt. 425). Group One, composed of four defendants who are not subject to the death penalty upon conviction, has a trial date of May 7, 2019. See 8/28/2018 Order (Dkt. 464); 2/22/2019 Minute Entry (adjourning Group One trial date). Group Two, composed of two defendants who are death-penalty eligible, has a trial date of April 21, 2020. See 8/31/2018 Order (Dkt. 475). Johnson belongs to Group One.

⁴ The "Chedda Grove" part of the enterprise's name is partially derived from one of the main streets in this territory—Cedargrove Street. Id.

through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). See id. at 2. The Government alleges that the defendants agreed that a conspirator would commit two acts of racketeering activity, which purportedly included threats and acts of murder, robbery, and dealing in controlled substances. Id. at 9-10.

According to the Government, defendants and co-conspirators used rap videos, songs, and lyrics to document these racketeering activities, as well as their association with each other and the enterprise. Gov't Resp. at 2. Defendants also promoted and furthered the goals of the enterprise through these videos, songs, and lyrics. Id. Members and associates of the enterprise often use distinctive hand signs, like the number "6" or the letter "E" to reference the enterprise's territory on the east side of Detroit, as well as wear certain clothing, see 2d Superseding Indictment at 4, which can be seen in the rap videos, see Gov't Resp. at 8-9.

The Government intends to admit the following nine rap songs, lyrics, and videos during trial:

1. 42 Twin featuring Team Eastside Peezy;
2. Team Eastside Peezy – "In These Streets" (official video);
3. Team Eastside Peezy – "Looking Crazy" (official video);
4. Team Eastside Peezy – "Real N***as Win" (official video);
5. Team Eastside Peezy – "Trenches" (official promotional video);
6. Team Eastside Peezy – "Out The Hood" (directed by SuppaRay);
7. Team Eastside Peezy – "The Intro" (Exclusive) (directed by SuppaRay);
8. Team Eastside Peezy – "Young N***a World"; and,

9. Team Eastside Peezy – "B4 Rap."[5]

See Def. Mot. at 1-2; Gov't Resp. at 3.[6]

## II. DISCUSSION

Johnson seeks to preclude the Government's use of nine rap lyrics and videos during trial, claiming that they are protected speech under the First Amendment, and that their content is unduly prejudicial under Federal Rule of Evidence 403. Johnson also requests additional information about the videos and a pretrial hearing to address the admissibility of each video. The Court addresses each issue in turn.

### A. The First Amendment

Johnson argues that the First Amendment protects freedom of speech and expression, including music, and the rap lyrics and videos at issue in this case are forms of artistic expression entitled to a heightened level of protection. Def. Br. at 5-7; see also id. at 6 (noting that "rap lyrics have their own artistic and poetic conventions," the use of which "is commonly understood in more traditional arts such as fiction writing and poetry"). This evidence also represents a "social and political commentary on impoverished black neighborhoods in our inner cities." Id. at 8. Rap lyrics addressing "urban crime and violence, drug wars, and the utter lack of hope in our inner cities" are matters of public concern, says Johnson, which lie "'at the heart of the First Amendment's protection.'" Id. at 8-9 (quoting Snyder v. Phelps, 562 U.S. 443, 451-452 (2011)). Because the rap lyrics and videos are protected speech, Johnson contends that their introduction at

---

[5] The Government has filed a compact disc containing the nine rap videos. See 9/28/2018 Notice of Filing Exhibit (Dkt. 519); 9/28/2018 Exhibit, Compact Disc (Dkt. 520). The Court has viewed each video.

[6] In its response, the Government notes that, collectively, these nine rap songs are less than 40 minutes in length, and that it will be "judicious in paring down and selecting the most relevant 6 Mile rap songs to present to the jury." Gov't Resp. at 21-22 & n.3.

4

trial would violate his rights under the First Amendment, particularly when these lyrics and videos are "fictional" and amount to nothing more than "generalized abstract beliefs." Id. at 12-13 (citing Dawson v. Delaware, 503 U.S. 159, 167 (1992)) (quotation marks omitted). This Court disagrees.

The First Amendment to the U.S. Constitution guarantees that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I, and these protections extend to music as a form of artistic "expression and communication," Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989). Assuming without deciding that the rap lyrics and videos in this case are protected speech under the First Amendment, see Betts v. McCaughty, 827 F. Supp. 1400, 1406 (W.D. Wis. 1993), this does not mean that there is a "per se barrier to the admission of evidence concerning [Johnson's] beliefs and associations," Dawson, 503 U.S. at 165.

The Government is permitted to use evidence of a defendant's speech for a proper purpose during trial, such as establishing "the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993); accord Barclay v. Florida, 463 U.S. 939, 948-949 (1983) (plurality opinion) (in prosecution for first-degree murder, upholding the consideration of defendant's racial intolerance in evaluating motive and as an aggravating factor). A defendant's "abstract beliefs," on the other hand, cannot be admitted into evidence "when those beliefs have no bearing on the issue being tried." Dawson, 503 U.S. at 168. Nor can the Government introduce evidence of a defendant's speech simply to portray that defendant as "morally reprehensible" based on the views he or she has expressed. Id. at 167. Thus, the crucial question for purposes of the First Amendment is "whether the evidence at issue [is] used for permissible purposes or merely to show that [the defendant] was morally reprehensible due to his abstract beliefs." United States v. Fell, 531 F.3d 197, 229 (2d Cir. 2008) (citation and quotation marks omitted).

5

Johnson is not facing prosecution based on any purported abstract beliefs contained in the nine rap videos and lyrics the Government intends to introduce during trial. Nor have these lyrics or videos been subjected to any governmental restrictions or regulations in connection with this case. United States v. Caronia, 703 F.3d 149, 162-163 (2d Cir. 2012) ("The First Amendment protects against government regulation and suppression of speech on account of its content."). Rather, the Government seeks to introduce this evidence for permissible purposes—namely, to establish the existence of the 6 Mile Chedda Grove enterprise, Johnson's participation in and association with members of the enterprise, and the alleged purposes of the enterprise. See Gov't Resp. at 10; United States v. Pierce, 785 F.3d 832, 841 (2d Cir. 2015) (holding that admission of rap video did not violate the defendant's First Amendment rights because "it was used to establish the existence of, and [the defendant's] participation in, the alleged RICO enterprise"); accord United States v. Norwood, No. 12-CR-20287, 2015 WL 2343970, at *11 (E.D. Mich. May 14, 2015) (admitting rap lyrics where the lyrics "helped establish the existence of the enterprise, its members, and at least one of its alleged purposes").[7]

Despite Johnson's protestation that the Government's "intended use of the rap lyrics/videos at issue is nothing short of unadulterated racism," Def. Reply at 1, these proffered purposes are entirely distinct from any incidental portrayal of Johnson as a morally reprehensible person; they bear on specific issues relevant in this case, i.e., charges of racketeering conspiracy and establishing a pattern of racketeering activity. See United States v. Salameh, 152 F.3d 88, 110, 112 (2d Cir. 1998) (upholding use of evidence of political speech or beliefs to prove the existence

---

[7] Johnson acknowledges in his motion that "[i]t is anticipated that the Government will attempt to use the aforementioned rap lyrics and rap videos to establish the existence of a criminal enterprise and to otherwise show that the Defendants are criminals." Def. Br. at 1. Notably, Johnson does not provide any case law to suggest that using protected speech to establish the existence of a RICO enterprise or a defendant's participation in that enterprise is an impermissible purpose.

of a conspiracy and its motive); United States v. Herron, No. 10-CR-0615, 2014 WL 1871909, at *2-3 (E.D.N.Y. May 8, 2014) (rejecting the defendant's argument that introducing rap-related videos violates the First Amendment where the government sought "to introduce them as proof of the existence of the alleged criminal enterprise, Defendant's membership and position therein, his association with other members, his familiarity with firearms, and a motive or plan to commit the charged conduct").

Regarding the existence and purposes of the enterprise in particular, the Government avers that the nine rap videos are relevant because "many of the Defendants are depicted with each other, at known locations important to the 6 [M]ile enterprise, while brandishing firearms, displaying gang hand signs, and wearing gang clothing." Gov't Resp. at 8. The videos also "provide a visual representation of the clothing, symbols, tattoos, hand signs, and territory of the 6 Mile enterprise." Id. at 8-9. More importantly, the lyrics of the songs "discuss and promote the goals and purposes of the 6 Mile enterprise, which is to earn money through narcotics trafficking and violence, and the means the 6 Mile enterprise uses to accomplish its goals, including violence and threat of violence against rivals." Id. at 9.

In each of the nine rap videos, co-defendant Phillip Peaks performs most of the rap lyrics himself while other co-defendants participate in the songs by wearing gang clothing, making gang signs, throwing money, and singing along to the lyrics, all of which the Government claims demonstrates their adoption and belief in the statements. See Gov't Resp. at 14. For example, in the song "B4 Rap," Peaks raps about co-defendant Edwin Mills assisting with narcotics distribution. See Song Excerpts at PageID.2496, Ex. 1 to Gov't Resp. (Dkt. 513-1) ("Got my sack in the back, in the yard by the bushes, my n***a Ed Boy sittin' in the car with the bullets."); 9/28/2018 Exhibit, Compact Disc (Dkt. 520). Co-defendants Edwin Mills, Carlo Wilson, Lomnil

7

Jackson, Corey Mills, and Michael Richardson are also depicted in the video brandishing firearms and displaying gang hand signs while inside the Hayes Troester Super Market. Throughout the song, Peaks raps about "running with the killers," "selling hella dope," and "been on Chedda Grove," id., all of which the Government posits are references to racketeering activities of the 6 Mile Chedda Grove enterprise and its name, see Gov't Resp. at 11. Because the Government has "tied the lyrics to the actions of the defendants," the rap lyrics and videos are not simply Defendants' abstract beliefs as contemplated in Dawson. United States v. Graham, 293 F. Supp. 3d 732, 737-738 (E.D. Mich. 2017).

Furthermore, Johnson's reliance on Snyder is misplaced. That case involved abhorrent speech by members of the Westboro Baptist Church directed at homosexuality during a military funeral and concerned a civil lawsuit seeking to impose tort liability for the expression of speech itself. Snyder, 562 U.S. at 458-459 (affirming the lower court's decision to overturn a jury verdict that imposed civil liability for intentional infliction of emotional distress caused by the defendants' picketing of a soldier's funeral); see also Graham, 293 F. Supp. 3d at 737 ("Snyder addressed a civil lawsuit seeking to hold the members of a church liable for the content of, and harm caused by, their speech."). The Supreme Court never addressed the reach of the First Amendment regarding the use of speech as evidence in criminal trials. In fact, the Court made clear that its holding was narrow and limited to the facts before it. Snyder, 562 U.S. at 460 ("Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us."). Johnson does not meaningfully explain how Snyder extends beyond the particular facts of that civil case and is applicable in a criminal case where the defendant's speech is used as evidence to establish the elements of a crime.

Any importation of the ruling from the context of that case to our case would be hard to substantiate. The defendants in Snyder were facing tort liability for intentional infliction of emotional distress based on the political content of their speech, including homosexuality in the military—which content the jury had to evaluate to determine whether the defendants' protests about homosexuality satisfied the state-law standard for "outrageousness." Snyder, 562 U.S. at 451, 458. Because of the political nature of the speech, the Supreme Court held that a jury's finding of outrageousness would pose too great a danger that the defendants would be punished for their views on matters of public concern. Id. at 458 (noting that "outrageousness" is a "highly malleable standard with an inherent subjectiveness" that would allow the jurors to impose liability based on their tastes, views, or "their dislike of a particular expression"). That the jury might well lack neutrality given the content of the speech, thereby creating "a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression," was an unacceptable risk under the First Amendment. Id. ("[I]n public debate we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.").

Unlike the defendants in Snyder, Johnson is not facing punishment based on the offensiveness of the content of the rap videos and lyrics. Rather, the Government intends to use this evidence to establish the existence of the 6 Mile Chedda Grove enterprise, Johnson's participation in and association with members of the enterprise, and the alleged purposes of the enterprise, all of which is permissible under Mitchell and Barclay. The Supreme Court's concern in Snyder that an individual would be punished purely because a jury disliked the political content of the speech—resulting in the suppression of unpleasant expression on matters of public concern—is simply not present here.

This is not the first time a judge in this District has been presented with the issue of whether the admission of rap lyrics and/or videos in a RICO conspiracy case would violate a defendant's First Amendment rights. In United States v. Garnes, No. 14-20119, 2015 WL 3574845 (E.D. Mich. June 5, 2015) (Edmunds, J.), the defendant was a member of the Bounty Hunter Bloods street gang in Detroit, Michigan. He argued that the rap lyrics found at his residence were protected under the First Amendment and, relying on Dawson, they should be excluded from trial. The court rejected the defendant's argument as meritless, explaining that, "[u]nlike in Dawson, Defendant's lyrics will be relevant to the issues being decided in the proceeding (i.e., his membership in the Bounty Hunters gang)." Garnes, 2015 WL 3574845, at *2 n.1 (citing Pierce, 785 F.3d at 841).

More recently, in United States v. Graham, 293 F. Supp. 3d 732 (E.D. Mich. 2017) (Steeh, J.), the defendants were members of the Seven Mile Bloods street gang in Detroit, Michigan.[8] They, too, argued that their rap lyrics and videos were a form of artistic expression subject to heightened protection under the First Amendment. As in Garnes, the court rejected the defendants' First Amendment argument, explaining that, unlike in Snyder, "the government is not seeking to punish defendants because of the content of the speech; rather the speech is being introduced as evidence of independent criminal behavior." Graham, 293 F. Supp. 3d at 737. And unlike in Dawson, the court found that the rap lyrics were "not merely abstract beliefs of the defendants, because the government has tied the lyrics to the actions of the defendants." Id. at 738.

For all these reasons, the Court rejects Johnson's First Amendment argument and denies this portion of his motion.

**B. Federal Rule of Evidence 403**

---

[8] The Seven Mile Bloods is a rival gang that has purportedly clashed with the 6 Mile Chedda Grove gang. See 2d Superseding Indictment at 5; Gov't Resp. at 6.

Johnson argues that the rap lyrics and videos should also be excluded under Federal Rule of Evidence 403 because they "'contain language and imagery related to drugs, gun crime, violence . . ., and other potentially offensive themes,'" such that "'[a]dmitting them into evidence presents a serious risk of inflaming the jurors and influencing them to convict [the defendant(s)] on impermissible grounds.'" Def. Br. at 15 (quoting United States v. Bey, No. 16-290, 2017 WL 1547006, at *7 (E.D. Pa. Apr. 28, 2017)). This Court disagrees.

Rule 403 provides that this Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. The phrase "unfair prejudice," when used in the context of Rule 403, "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." United States v. Ford, 761 F.3d 641, 648 (6th Cir. 2014) (quoting United States v. Gibbs, 182 F.3d 408, 430 (6th Cir. 1999)); see also Old Chief v. United States, 519 U.S. 172, 180 (1997) ("Unfair prejudice within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (quoting Fed. R. Evid. 403 advisory committee's note)).

In this case, Johnson has been charged with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). To establish this offense, the Government must prove the following four elements: (i) an agreement, (ii) to conduct or participate, (iii) in an enterprise, (iv) through a pattern of racketeering activity. See Salinas v. United States, 522 U.S. 52, 62-63 (1997); see also United States v. Gills, 702 F. App'x 367, 373 (6th Cir. 2017). The rap lyrics and videos in this case are relevant because they tend to establish the existence of the 6 Mile Chedda Grove enterprise, racketeering activities purportedly committed by members of the enterprise, and the alleged purposes of the enterprise. See Norwood, 2015 WL 2343970, at *11 (admitted rap videos in a

RICO conspiracy case because they "helped establish the existence of the enterprise, its members, and at least one of its alleged purposes and/or means and methods: evading law enforcement by using threats and violence to dissuade witnesses from 'snitching'"); accord United States v. Williams, 158 F. App'x 651, 653 (6th Cir. 2005) ("Although prejudicial to a defendant, evidence of gang affiliation can be sufficiently probative to survive a Rule 403 challenge.").[9] Thus, to be inadmissible under Rule 403, the probative value of these rap lyrics and videos must be substantially outweighed by a danger of unfair prejudice.

Unfortunately, Johnson's conclusory argument is woefully undeveloped, and, therefore, he has failed to carry his burden of demonstrating unfair prejudice. Although he claims that the lyrics in this case "are profanity-laden, and replete with misogynistic, sexist, and racist language, images, and epithets," Def. Br. at 1, Johnson never directs the Court to any specific language or verse from any of the nine rap videos and lyrics to support his conclusion that they reference these potentially offensive themes. But even if he had done so, Johnson does not attempt to explain why those verses are so highly inflammatory that they would create an undue tendency for the jury to decide the case based on an improper basis. Rather than point to specific lyrics and explain their allegedly inflammatory nature, Johnson simply employs hyperbolic language and makes unsubstantiated claims. See, e.g., Def. Reply at 2 ("The Government's objective is to obviously perpetuate the stereotype of poor inner-city African-American males" by trying to show that "because the Defendants are poor, black, live in the ghetto, and rap, they must all be gang bangers."); id. ("The

---

[9] For this reason, the principal case Johnson relies on in support of his argument is distinguishable. In Bey, the defendant was charged with a discrete crime—felon in possession of a firearm. The court held that much of the inflammatory material in rap videos performed by the defendant, which included references to the Black mafia, Louis Farrakhan, John Dillinger, and statements relating to the killing of Jews, had no bearing whatsoever as to whether the defendant possessed a firearm on the date charged such that any probative value of this evidence was substantially outweighed by the danger of unfair prejudice under Rule 403. 2017 WL 1547006, at *7-8.

Government intends to frighten the jury with rap videos that feature poor inner-city African-American males that most of white American[s] fear[].").  Despite Johnson's failure to properly focus and substantiate an attack on the lyrics, the Court undertook its own review of the videos and could detect nothing inflammatory as to prompt a jury to decide this case on an improper basis.

Accordingly, the Court concludes that the probative value of the rap lyrics and videos is not substantially outweighed by a danger of unfair prejudice.  See United States v. Stuckey, 253 F. App'x 468, 482-483 (6th Cir. 2007) (concluding that, although there is some danger of prejudice when a juror hears "profane, offensive, and violent rap lyrics written by a defendant," the rap lyrics were highly probative because they "concerned killing government witnesses and specifically referred to shooting snitches, wrapping them in blankets, and dumping their bodies in the street— precisely what the Government accused [the defendant] of doing to [the witness] in this case"); see also United States v. Moore, 639 F.3d 443, 447-448 (8th Cir. 2011) (affirming admission of profane and violent rap recordings over Rule 403 challenge where lyrics were probative of the defendant's participation in narcotics conspiracy); United States v. Belfast, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that the defendant was associated with his father's Anti-Terrorism Unit).  And because rap, as an aspect of the larger cultural movement of hip hop, is a mainstream and widely recognized music genre, the Court finds it highly unlikely that any reasonable juror nowadays could conclude that Johnson is guilty of racketeering conspiracy merely because the rap songs contain potentially offensive themes.  See Stuckey, 253 F. App'x at 484 (recognizing that rap music "is no longer an underground phenomenon and is a mainstream music genre," and, therefore, it is unlikely that reasonable jurors

would reason that "a rapper is violent simply because he raps about violence"). This portion of Johnson's motion is denied.[10]

### C. Requests for Pretrial Hearing and Additional Information Pertaining to Rap Lyrics and Videos

In the event the Court considers admitting the rap videos over his First Amendment and Rule 403 objections, Johnson requests that it conduct a pretrial hearing "to determine whether an extra-judicial statement by one alleged co-conspirator could be used in evidence against another alleged co-conspirator." Def. Br. at 17. Johnson refers to this pretrial hearing as a "James" hearing, as derived from the case United States v. James, 590 F.2d 575 (5th Cir. 1979). See Def. Br. at 16-18.

In its response, the Government contends in a cursory manner that the rap songs are admissible as admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(A), statements the party manifested that it adopted or belief to be true under Rule 801(d)(2)(B), or statements made by a co-conspirator during and in furtherance of the conspiracy under Rule 801(d)(2)(E). Gov't Br. at 14. However, the Government did not squarely address Johnson's request for a pretrial hearing to determine whether hearsay statements in the rap lyrics and videos would be admissible as co-conspirator statements under Rule 801(d)(2)(E).

Regarding Johnson's request for a pretrial hearing, the Court first notes that, in the Fifth Circuit, a James hearing is one potential method for a district court to address whether co-conspirator statements are admissible under the hearsay exception in Rule 801(d)(2)(E). See United States v. Williams, 264 F.3d 561, 576 (5th Cir. 2001) (citing James, 590 F.2d at 581). In the Sixth Circuit, a similar pretrial hearing is referred to as an Enright hearing, see United States

---

[10] Of course, nothing in this opinion precludes Johnson or his co-defendants from arguing the weight of the rap lyrics and videos or the meaning ascribed to those lyrics during trial.

v. Enright, 579 F.2d 980 (6th Cir. 1978), and it was the subject of both Johnson's and Defendant Carlo Wilson's motions regarding the admissibility of co-conspirator statements (Dkts. 371, 561, respectively). In a separate opinion on those motions, the Court held that the necessity of an Enright hearing will depend on the Government's written proffer of any Rule 801(d)(2)(E) evidence it intends to offer at trial, which is due sixty days before trial, as well as any response by Defendants. See United States v. Mills, No. 16-cr-20460, 2019 WL 77032, at *4-5 (E.D. Mich. Jan. 2, 2019). Because Johnson's concern with the hearsay aspects of the videos will be addressed by the process previously ordered, the Court denies this portion of Johnson's motion without prejudice.

In addition to an Enright hearing, Johnson also requests a court order directing the Government to provide the following information, presumably for foundation and authentication purposes:

> [W]ho appears in each video; who speaks; what was said; who wrote the lyrics; when was each video produced; who produced it; was it edited; and if so, by whom and when; who will testify for foundation regarding the content of the video and is the testimony based on personal knowledge, did the speaker intend to make factual assertions under FRE 801; were the statements in furtherance of the conspiracy; and what is the government evidentiary theory of admissibility as to each video?

Def. Br. at 17. Johnson believes that "each question must be addressed with regard to each individual video," even if "it is likely some of the answers are unknown." Id. The Government did not squarely address Johnson's requests for additional information.

Regarding Johnson's request for additional information about the rap lyrics and videos, the Court grants in part this portion of Johnson's motion. The Government shall file a brief on March 25, 2019, setting forth the proposed foundation to admit the rap lyrics and videos at trial. Defendants may then file a response by April 8, 2019. At that point, the Court will be in a better

position to revisit Johnson's request for additional information based on any genuine disputes concerning the foundation and authentication of the rap lyrics and videos.

### III.  CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Johnson's motion to preclude the Government from using the nine rap lyrics and videos during trial (Dkt. 367).

SO ORDERED.

Dated: March 7, 2019  s/Mark A. Goldsmith
 Detroit, Michigan  MARK A. GOLDSMITH
 United States District Judge